# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

MICHAEL HUGGINS

07-025-M-01

## WARRANT FOR ARREST

CASE NUMBER: 07-327 CBD

USM 33331083

**FILED**

FEB 0 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

To: The United States Marshal
and any Authorized United States Officer

### YOU ARE HEREBY COMMANDED TO ARREST MICHAEL HUGGINS
Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment ☐ Information ☒ Complaint ☐ Order of court ☐ Violation Notice ☐ Probation Violation Petition

**charging the defendant with** (brief description of offense)

On or about October 24, 2005, in Prince George's County, in the District of Maryland, the defendant MICHAEL HUGGINS, did knowingly, intentionally and unlawfully possess with intent to distribute a mixture or substance containing a detectable amount of cocaine, a schedule II controlled substance, in violation of Title 21 United States Code, Section 841(a)(1).

CHARLES B. DAY
Name of Issuing Officer

United States Magistrate Judge
Title of Issuing Officer

February 1, 2007 at Greenbelt, Maryland
Date and Location

(By) Deputy Clerk

NO BOND pending initial appearance
Bail Fixed at $ _before judicial officer_      by Charles B. Day, United States Magistrate Judge
                                                Name of Judicial Officer

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at _2145 hrs_ | | |
| **DATE RECEIVED** 2-1-07 **DATE OF ARREST** 2-2-07 | **NAME AND TITLE OF ARRESTING OFFICER** Reporting Fitzgerald, Derrick DUSM | **SIGNATURE OF ARRESTING OFFICER** Reporting |

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

## For The District of Maryland

07 - 025 - M - 01

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL COMPLAINT** |

V.

Michael Huggins
DOB:

CASE NUMBER: 07-327 CBD

FILED

FEB 0 2 2007

(Name and Address of Defendant)

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about _____October 24, 2005_____  in _____Prince Georges_____ County, in the _____ District of __Maryland__ defendant did, (Track Statutory Language of Offense)

knowingly, intentionally and unlawfully possess with intent to distribute a mixture or substance containing a detectable amount of cocaine, a schedule II controlled substance

in violation of Title ___21___ United States Code, Section(s) ___841(a)(1)___ .

I further state that I am __a Special Agent with the Federal Bureau of Investigation__ ,  and that this complaint is based on the following facts:

**See Attached Affidavit**

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

_Yanta_
Signature of Complainant
Stephanie Yanta, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

Date    __2/1/07__

__Charles B. Day__
Name & Title of Judicial Officer

at    ___Greenbelt, Maryland___
City and State

__Carl R. Day__
Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE APPLICATION OF   )
THE UNITED STATES OF AMERICA FOR      )      NO.
A CRIMINAL COMPLAINT                  )

## AFFIDAVIT

I, Stephanie E. Yanta, Special Agent with the Federal Bureau of Investigation (FBI),

Washington Field Office, Washington, D.C., (hereinafter affiant) being duly sworn, depose and

state as follows:

### A. INTRODUCTION

I am "an investigative or law enforcement officer" of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18, United States Code.

I have been a Special Agent with the FBI since March 1998. I am currently assigned to

the Joint Terrorism Task Force. Prior to that I was assigned to the Safe Streets Task Force,

which is tasked with the investigation of violent narcotics traffickers in the District of Columbia

and elsewhere. I have previously participated in investigations that led to the arrest and

conviction of narcotics dealers. Since 1998, I have received training and developed experience in

interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white

collar crimes, search warrant applications, and various other crimes. In the course of my training

and experience, I have become familiar with the methods and techniques associated with the

distribution of narcotics, the laundering of drug proceeds, and the organization of drug

conspiracies. In the course of conducting these investigations, your affiant has been involved in



the use of the following investigative techniques:  interviewing informants and cooperating

witnesses; conducting physical surveillance; conducting short-term and long-term undercover

operations, including reverse undercover drug operations; consensual monitoring and recording

of both telephonic and non-telephonic communications; analyzing telephone pen register and

caller identification system data; conducting court-authorized electronic surveillance; and

preparing and executing search warrants which have led to substantial seizures of narcotics,

firearms and other contraband.

    Through instruction and participation in investigations, your affiant has become familiar

with the manner in which narcotics traffickers conduct their illegal business and the methods,

language, and terms that are used to disguise conversations about their narcotics activities.  From

experience and training, your affiant has learned, among other things, that:(a) drug traffickers

virtually never expressly refer to cocaine or other illegal drugs by name; instead to conceal the

true nature of their illegal activities and to thwart detection by law enforcement, they refer to the

drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use

electronic paging devices, commonly referred to as pagers or beepers, cellular telephones, digital

telephones, and other communications devices to further their illegal activities by, among other

things, remaining in constant or ready communication with one another without restricting either

party to a particular telephone or location at which they might be the subject of physical

surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-

arranged numerical codes to pagers or telephones to identify themselves or to otherwise

communicate information, such as price or quantity of drugs, to the person in possession of the

pager.

2

Throughout this investigation, your affiant has worked with other Special Agents (SAs) of the FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD) assigned to the Safe Streets Task Force. This affidavit is based on my personal knowledge derived from my participation in this investigation, as well as speaking with other law enforcement officers assigned to this investigation, and includes, but is not limited to, the following information: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; and (f) review of wire interceptions pertaining to the target telephone authorized by United States District Court Judge Paul L. Friedman on September 2, 2005, and extended on September 30, 2005, and (g) debriefings of confidential informants and cooperating witnesses..

**MICHAEL ANDRE HUGGINS** is a black male, born                          He is described as 5'11" tall and 171 pounds, with a Social Security Number of                          A search of FBI criminal history records for **HUGGINS**                          revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Providing Contraband (Heroin) to an Inmate, in 1995.

## PROBABLE CAUSE

In early September of 2005, the FBI went up on a Title III wire intercept focused on Antoine Jones. Several informants who had proved reliable in the past reported that Jones was a significant distributor of cocaine in the DC metropolitan area. Several of the informants had personally received large quantities of cocaine from Jones. Based on the Title III, investigators

3

identified Jones's chief source, the stash house where Jones's source stored large quantities of cocaine, and a number of purchasers of cocaine from Jones including Huggins, John Adams, Demetrius Johnson, Kevin Holland, Kirk Carter, and a number of others. This conclusion was based on the frequency of calls between Jones and these purchasers and the use of coded terms. Adams later cooperated and confirmed that "tickets" and "uncle" among other terms were frequently used by members of the organization to refer to drugs or the source of drugs. For example:

On September 3, 2005 at 9:14 a.m., Jones called **MICHAEL HUGGINS** at

., and spoke to an unidentified male, who told him that "Mike" wasn't there. At 9:15 a.m.,

Jones called              , the cellular telephone listed in the name of **MICHAEL HUGGINS**, and left a message asking "Mike" to call him. Then, at 1:51 p.m., Jones called **HUGGINS** again

at              d stated that he was "outside." **HUGGINS** stated that he would be down in a couple of minutes. Investigators believe that within a few minutes of this call, Jones and **HUGGINS** engaged in a narcotics transaction.

On October 13, 2005, at 5:25 p.m., Jones called a 909 number that investigators believe was used by an individual supplying Jones with cocaine. The user of that phone, Roel Bermea, was later arrested and agreed to cooperate with the government. Bermea answered the call and said that he would only be around until 8:00 p.m., and then he was going to meet the girls. Jones said he would swing by, either before then or the following morning. Jones also referenced "20 of the VIP tickets." Jones followed up on this call at 7:13 p.m, when he called the (909) number again and stated that he was 5-10 minutes away. Once he began cooperating, Bermea confirmed that these calls involved a shipment of kilos of cocaine that was scheduled to arrive late that day

4

or early in the morning on the next day. Approximately 30 minutes later, in rapid succession over the course of 8 minutes, Jones called Holland, Johnson, **HUGGINS**, and Adams, each call lasting between 41 seconds and 1 minute and 35 seconds. For unknown reasons, the wire tap equipment transmitted no audio with respect to these calls (or several non-pertinent calls thereafter). Nonetheless this flurry of calls by Jones to his usual purchasers, in the immediate aftermath of his discussions with Bermea, indicates that Jones was notifying his customers that another shipment was coming through.

On October 12, 2005, at 12:36 p.m., Jones received a call from Bermea, who stated, "hey, the girls are coming tomorrow night." Jones responded in an animated voice, "gotcha, gotcha, gotcha." Bermea later confirmed what they had believed at the time of the call, that it related to another shipment of cocaine that was to arrive the next day. Then, in his next call, at 12:44 p.m., Jones called Adams, and told Adams to tell his brother-in-law "sometime tomorrow." Clearly confused, Adams said, "huh?" Jones said, "brother-in-law. Youngin' didn't tell you about brother-in-law?" Jones repeated "tomorrow" several times throughout the conversation. Finally, Adams seemed to understand, saying, "Tomorrow? Oh, okay, you must mean my cousin." Jones told Adams that he needed to "see you all" today so that he could be ready with his video tomorrow. Adams later confirmed that these conversations involved Jones collecting money from his customers to be ready for the cocaine shipment the following day. Then, at 12:47 p.m., Jones received a call from an unknown subscriber, using cellular telephone numbe                    , who told Jones that he just wanted Jones to know that he was back. Jones and the caller discuss their whereabouts, and then at the end of the brief conversation, Jones said to the caller, "I was talking to your uncle, they they, he said he's gonna come talk to

5



you tomorrow." Next, at 1:40 p.m., Jones received a call from **HUGGINS**. Jones told **HUGGINS** that he spoke with "Playboy" and then stated "tomorrow sometime, man." **HUGGINS** replied that he was waiting on Jones.

That shipment did arrive, as confirmed by Bermea, and on Saturday, October 15, 2005, Jones was again contacting his cocaine purchasers. At 10:10 a.m. that day, Jones called Johnson and asked whether Johnson wanted him to come through and catch him. Johnson replied that he was still waiting on two dudes, and would call Jones as soon has he had caught up with them. Shortly thereafter, Jones called **HUGGINS** and told him he was about to "make a run" and asked what was up with **HUGGINS**. The pair agreed to meet at the Lowe's home improvement store in Clinton, Maryland. A subsequent call, at 11:45 a.m., revealed that Jones and **HUGGINS** met up at the Lowe's. Over the course of the next several hours, Jones called Carter, Adams, Johnson, and a number of others arranging similar meetings.

On October 24, 2005, a number of search warrants were executed based on the TIII and other investigative techniques. Ninety-seven (97) kilos of cocaine powder, one kilo of crack, and over $800,000 were seized at the stash house. Bermea and several others were arrested at that house. Distribution quantities of cocaine were seized from locations connected with several of Jones' customers, including Adams' and Johnson's homes.

A search was also conducted that day at                           Maryland which had been identified as Huggins home through a number of records, including subscriber records for his cell phone and property records for the home. In the master bedroom agents located a little over 1/8 kilo of cocaine, a little more than $10,000 in cash, and a number of identifications and various records with Michael Huggins' name and/or photo on them. Huggins and his wife

6

were not present at the time of the search, but a 16 year old boy was found in one of the other bedrooms. He said that his mother and stepfather, Michael Huggins, occupied the master bedroom but they had already left for work. Huggins self-surrendered to the FBI within a day or two of the search.

Adams recalls having delivered cocaine from Jones to Huggins on several occasions and picking up money from Huggins for Jones at least once. These meetings all occurred in the immediate vicinity of the Barto Road house[1].


I swear and subscribe to the information contained in this Affidavit:


STEPHANIE E. YANTA
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me this 1st day of February, 2007 in the District of Maryland.

Charles B. Day
UNITED STATES MAGISTRATE JUDGE


---

[1] Huggins was charged in the United States District Court for the District of Columbia with a conspiracy under 21 U.S.C. 846 and various phone counts under 21 U.S.C. 843(b) arising out of these events. He was acquitted of the conspiracy and a number of phone counts. The jury was unable to reach a verdict on one of the phone counts. Possession with intent to distribute based on the cocaine seized at Barto Road was not charged in that case.

7